MOORE, Judge.
S.M.M. (“the mother”) appeals from a judgment of the Etowah Juvenile Court (“the juvenile court”) terminating her parental rights to J.R.M. (“the child”). We reverse.

Background

On January 27, 2011, R.S.M. (“the father”) petitioned the juvenile court to terminate the mother’s parental rights to the child. The father sought to terminate the mother’s parental rights because, he alleged, the mother had failed to provide for the material needs of the child, to pay a reasonable portion of the child’s support, and to maintain substantial contact with the child.
The mother, appearing pro se, denied the allegations of the father’s petition. On March 23, 2011, the juvenile court conducted a hearing on the father’s petition to terminate the mother’s parental rights; ore tenus evidence was received at that hearing. On March 28, 2011, the juvenile court entered its judgment terminating the mother’s parental rights. The mother timely filed her notice of appeal.

Analysis

The purpose of the statute authorizing termination of parental rights is to protect children from harm emanating from an adverse parental relationship. See generally Ex parte A.S., 73 So.3d 1223 (Ala.2011). A juvenile court may terminate parental rights in order to protect a child from harm, but the law demands that a juvenile court use less drastic measures than termination of parental rights if those measures would adequately protect the child from harm. See Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990). Hence, before entering a judgment terminating parental rights, a juvenile court must consider all alternatives, and, if the evidence shows that a viable alternative to termination of parental rights exists, the juvenile court cannot terminate parental rights. Id. In this case, the mother argues primarily that the juvenile court erroneously terminated her parental rights when a less drastic and viable alternative existed that would adequately protect the child from harm.[1] We agree.
The facts relevant to the disposition of the appeal are as follows. The child was born of the marriage between the parties in 2002. The parties divorced in 2009, with the father receiving sole physical custody of the child subject to the right of the mother to visit with the child under the supervision of the father and at his discretion. At the time of the divorce, the mother was attending an inpatient drug-rehabilitation program, so she did not exercise much visitation with the child. The mother later was jailed from June 2009 through July 2010. During her incarceration, the mother contacted the father several times per week seeking visitation with the child, to which the father agreed on two or three occasions. The father also allowed the mother to visit with the child at a halfway house upon her release from jail.[2] The mother also visited with the child four or five times after she had left the halfway *574 house in December 2010 and after the father had filed his petition to terminate her parental rights. The father complained that, during one of the visits, the mother had allowed the child to walk around without shoes on a gravel playground and had allowed the child to sit on the bank of a “ditch [while] throwing rocks in the water.” However, the father presented no evidence indicating that the mother’s supervised visits had endangered the child physically or emotionally.
The father testified that he thought it would be best for the child if the mother’s parental rights were terminated so that he and the child could move to Florida to be nearer to the child’s paternal relatives.[3] The father also testified that he wanted to end his association with the mother because, he stated, she had falsely accused him of domestic violence in the past and “[fit’s an ongoing argument.” The father further complained that the mother had not fully complied with the child-support provisions of the divorce judgment.[4] The father also stated that the child was aware of the mother’s drug problem and her criminal problems — in fact, one of her criminal charges related to the theft of the child’s identity — and that he did not want the child to be involved with the mother. Finally, the father complained that the mother had provided the child several books on wrestling, a topic the child enjoyed, but that the child had found two pornographic pictures in those books.
When asked how termination of the mother’s parental rights would benefit the child, the father responded:
“Q: Well, it’s lack of support. The fraudulent charges. The restless nights I get. I hear noises, I get up, I check. I mean, that’s normal. But when, you know—
“A: But terminating parental rights wouldn’t stop that, would it? You already have full control, I guess is what I’m saying.
“A: I understand. But at least if the rights are taken, then the — her, herself, the way she is, with the lying, the stealing, the drugs, the company that she keeps, the lack of a steady house, the lack of support, the lack of medical support for my son, it’s like he is just something for her to hold on to. And it’s not right.”
The mother testified that she was 31 years old at the time of the termination hearing. She continued to insist that the father had committed domestic violence against her, and she denied that she had falsely accused him on any occasion. She admitted, however, that, in 2008, when the Etowah County Department of Human Resources (“DHR”) was involved with the family, she had falsely claimed to have cancer and had falsely claimed to have a broken arm; the mother testified that, at that time, she had been depressed and was seeking attention. The mother admitted that she had used drugs in the past, but, she testified, she had not used drugs since early 2009.
The mother also admitted that she had been convicted of identity theft involving the child and that she had been convicted *575 of theft involving her former roommate. The mother did not dispute the findings in her psychological assessment indicating that she suffers from mental-health conditions; she testified that she had received psychological treatment and that she had been prescribed medication to treat depression and sleep-related issues.[5]
According to the mother, she was jailed in February 2009 and, shortly thereafter, was ordered to drug rehabilitation at the “W.A.D.E. Freedom House.” The mother testified that she was dismissed from that program on July 15, 2009, for attempting to telephone the child during her work hours, which was against the rules. The mother testified that the father picked her up in Jacksonville on that day and drove her to his house, where he had law-enforcement officers waiting to arrest her for identity theft. According to the mother, she remained in jail from July 2009 until June 14, 2010, when she began the drug-rehabilitation program at “Rainbow of Hope,” which, she testified, she successfully completed on January 9, 2011. The mother testified that, since her completion of the Rainbow of Hope program, she had been teaching “Christians Against Substance Abuse” class and that, at the time of the termination hearing, she was still attending 12-step meetings.
The mother denied that she had placed any pornographic photographs in the wrestling books that she had given to the child. She testified that she had purchased those books at a yard sale as a gift for the child and that she had had no knowledge that the photographs were in the books. The mother acknowledged that she had not paid child support to the father until January 2011 and that, at that time, she had paid $500 to the father; the mother testified that she had earned that money providing care as a live-in aide to a man with Parkinson’s disease. The mother testified that she had provided the child a video game and a shirt at Christmas in 2010 but that, until that time, she had been unable to provide support or more substantial gifts for the child because she had been in jail or in drug rehabilitation.
The mother testified that she and the child typically talked on the telephone two or three times a week, but, she explained, she attempted to talk to the child more frequently. According to the mother, the father sometimes accommodated her requests, and sometimes refused her requests, to visit with the child. The mother also testified that the father had mentioned to her that he wanted to move to Florida. According to the mother, she had responded: “I’ll sign a paper that says you can move to Florida as long as you just let me see [the child].” The mother testified that the father filed his petition seeking to terminate her parental rights the same day they discussed his desire to move to Florida.
The burden is on the custodial parent seeking termination of the parental rights of the noncustodial parent to prove that no viable alternative to termination exists. See Beasley, supra. In this case, the father failed to prove that maintenance of the status quo would not adequately protect the child from the harmful conduct of the mother.
In Ex parte A.S., supra, a child’s maternal grandmother petitioned a juvenile court to terminate the parental rights of A.S., the mother, to that child. 73 So.3d at 1224. The juvenile court in that case granted that petition so that the grand *576 mother could adopt the child; the mother appealed. Id. at 1227. This court affirmed the juvenile court’s judgment, without an opinion, and the mother petitioned our supreme court for certiorari review. Id. at 1227-28.
Although recognizing that the child was dependent because the mother was incarcerated at the time of the termination hearing, 73 So.3d at 1227, the supreme court reversed the juvenile court’s termination of the mother’s parental rights. Id. at 1229. The supreme court concluded that a viable alternative to termination existed, i.e., that “[t]he grandmother’s maintaining custody of the child and having the ability to determine and supervise the mother’s visitation with the child is a viable alternative to termination of the mother’s parental rights while the mother is making progress towards rehabilitation.” Id. at 1229-30.
The supreme court stated:
“When determining whether to terminate an individual’s parental rights, ‘the primary focus of a court ... is to protect the welfare of children and at the same time to protect the rights of their parents.’ Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). Therefore, ‘a court should terminate parental rights only in the most egregious of circumstances.’ Id. ...
[[Image here]]
“ ‘ “[T]he termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated. The evidence in [this] case[ ] ‘does not rise to the level of being so clear and convincing as to support termination of the parental rights of the mother, such action being the last and most extreme disposition permitted by statute.’ ” ’ ”
Ex parte A.S., 73 So.3d at 1228-30 (quoting D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 439, 445 (Ala.Civ.App.2003), quoting in turn V.M. v. State Dep’t of Human Res., 710 So.2d 915, 921 (Ala.Civ.App.1998)).
We find several parallels between this case and Ex parte A.S., supra, but we note that the existence of a viable alternative to termination is more strongly established by the facts of this case than it was in Ex parte A.S. The mother in this case was no longer in jail at the time of the termination hearing, and she had demonstrated significant progress toward rehabilitating herself. She had been involved in parenting the child before being incarcerated, and she had continued to maintain frequent communication and visitation with the child while she was in jail and during her drug rehabilitation. Although the mother admitted that she had used illegal drugs in the past, by the time of the termination hearing she had successfully completed a drug-rehabilitation program, had been released from a halfway house, was participating in a 12-step program, and was teaching a class to help others deal with substance abuse. No evidence was offered to suggest that the mother was using illegal drugs or that she was likely to relapse.
Although the evidence indicates that the mother suffers from mental-health conditions, no evidence was offered to suggest that she posed a physical threat to the child or that the mother’s treatment and medication were insufficient to address her mental-health conditions. Additionally, she has been awarded only supervised visitation with the child. The father has sole custody of the child, and he has complete discretion over the mother’s visitation. Thus, in addition to the evidence offered by the mother indicating her improved stability and her improved emotional health, the father is in a position to ensure *577 the child’s safety during the mother’s visitations. Maintenance of the status quo and allowing the mother continued supervised visitation with the child adequately protects the welfare of the child while allowing for a beneficial relationship with both parents.
Based on the foregoing, we conclude that a viable alternative to termination of the mother’s parental rights exists. We therefore reverse the juvenile court’s judgment, and we remand the cause for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
PITTMAN and THOMAS, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.
BRYAN, J., concur in the result only, without writing.

. The mother also argues that the juvenile court did not have sufficient grounds to terminate her parental rights. In light of our disposition, we need not address that argument.

. The father acknowledged that he took the child to the halfway house "a few times” to visit with the mother, but, in his testimony, he identified only one visit at the halfway house. Thus, from the context of the father's testimony, we conclude that the father did not specifically identify all the visits that had occurred between the mother and the child since the parties’ divorce.

. The father testified that, until the termination hearing, he had been unaware that he could move to Florida with the child without having the mother's parental rights terminated.

. Although the father testified that the mother had not paid child support during her incarceration, he acknowledged that she had begun paying child support in January 2011, immediately upon her release from the halfway house. The father also admitted that the mother had provided the child a video game for Christmas and that she had provided the child with small gifts from time to time.

. According to Sandra Bumgardner, a DHR caseworker who had worked with the family in 2008, the mother had submitted to a psychological assessment and was determined to have "a personality disorder with schizoid and avoidance."