MOORE, Judge.
J.R.L. (“the mother”) appeals from a judgment of the Clay Juvenile Court (“the juvenile court”) terminating her parental rights to A.R.W. (“the child”).[1] We reverse.

Facts

The child was born on June 26, 2007, in Bessemer. At that time, A.W. (“the father”), to whom the mother was never married, was away serving in the United States Army and the mother was living at the father’s mother’s house. The father returned home approximately three weeks after the child was born. In December 2007, the mother left the father’s mother’s house, and she and the child moved into the mother’s mother’s house until March 2008, when the mother and the child moved into the mother’s grandmother’s house. The mother testified that the father was arrested in May 2008; that, to her knowledge, he had not seen the child since he had been arrested; and that, at the time of the trial, the father remained in the Shelby County Jail. According to the mother, she began forging checks that belonged to her grandmother, S.W. The mother testified that she had committed 43 separate forgeries, for a total of approximately $7,000, and that, in August 2008, she was arrested for 3 counts of possession of a forged instrument in the second degree. The mother testified that, at the time she was arrested, she and the child had been living with the mother’s then boyfriend, S.V., who is a registered sex offender, at S.V.’s sister’s house for approximately one week.
The mother testified that she used the money from the forged checks to purchase illegal drugs, clothes, and items for the child, among other things. According to the mother, she began using drugs when she was 15 or 16 years old. She had spent time at a number of rehabilitation facilities after being arrested for possession of marijuana when she was a minor. The mother testified that she had dropped out of school in the 11th grade but that she had later earned her general equivalency diploma in 2002 or 2003. According to the mother, she began using cocaine, heroin, and the prescription drug Oxycontin when she was 18 years old.[2] Although the mother testified that she had not used drugs while she was pregnant with the child, she stated that she had relapsed and had be *400 gun using drugs again right after the child was born and that, for up to three months before she was arrested in August 2008, she had used drugs every day, sometimes in front of the child.
The mother pleaded guilty to the three felony counts of possession of a forged instrument and, according to the mother, was sentenced to “five years suspended to five years probation.” On January 20, 2009, she was ordered to complete a drug-rehabilitation program at “LifeTech,” a drug-rehabilitation center operated by the Alabama Department of Corrections. The mother was kicked out of the LifeTech program on February 26, 2009, after admitting to LifeTech personnel that, while there, she had distributed Advil, a nonprescription pain reliever, to a girl. She returned to the Clay County Jail until May 2009, when a probation revocation hearing was held and she was sent to “A Woman’s Place,” a 28-day inpatient drug-rehabilitation program, which, she testified, she completed. Upon her completion of that program, she was sent to the “Phoenix House,” a halfway house. The mother testified that she graduated from the 90-day program at the Phoenix House at the end of November 2009 and that, upon her discharge from the Phoenix House, instead of returning to the Clay County Jail, she went home for two weeks without permission. According to the mother, her probation officer contacted her and told her that she had to report back to the Clay County Jail. Upon reporting to the jail, she was given a drug test, which she failed, testing positive for heroin.
The mother attended another probation-revocation hearing in January 2010, and, on February 18, 2010, she was ordered to go to “The Fellowship House,” another entity providing a drug-treatment program. The mother testified that she did not complete her treatment at The Fellowship House because she used drugs while she was there. She was discharged from The Fellowship House on March 15, 2010, at which time she again went home without permission instead of returning to jail. The mother testified that she returned to jail after about a week and a half; upon her return, she was given a drug screen, and she tested positive for opiates. According to the mother, in May 2010, she was going to be sent to “Lovelady,” a Christian drug-rehabilitation program. The mother testified, however, that the Lovelady facility is surrounded by “crack houses” and she did not want to put herself in a position where she knew she was going to fail, so she chose to go to Tutwiler Prison, where she remained until November 8, 2010.
When the mother was arrested on August 8, 2008, the child went to live with M.B. and R.B., who were family friends of the mother that she had known her entire life. The mother testified that she consented for the child to live with M.B. and R.B. so that they would be able to “sign for” the child in case the child needed to go to a doctor or a hospital. She testified that, although she had consented to the child’s being placed with M.B. and R.B., she felt that she did not have a choice. The mother testified that she had telephoned M.B. and R.B. from prison to check on the child and that she had visited the child whenever she had been allowed to, depending on M.B. and R.B.’s schedule. According to the mother, the child knows that she is her mother, she calls her “mama,” they are affectionate with each other, and they are bonding. The mother testified that, although she had not provided any financial support for the child, she always took things to give to the child when she visited.
The mother testified that, once she was released from prison in November 2010, *401 she got a job the next week at a Waffle House restaurant. She was still working at Waffle House restaurant at the time of the trial and had been promoted. She testified that she earns $400 to $700 per week, depending on the tips and bonuses that she receives. The mother stated that she was living at her mother’s house, where the child has her own room. She testified that she attends Alcoholics Anonymous (“AA”) and Narcotics Anonymous (“NA”) meetings approximately three or four times a week and that she had not used any narcotics or controlled substances since she had been released from prison.
R.B. testified that S.W., the mother’s grandmother, had asked R.B. if she could take care of the child when the mother was arrested in August 2008. R.B. testified that she took the child home with her on the day the mother was arrested and that the child has lived in her home since that time. R.B. testified that S.W. and the mother’s mother, D.S., had visited the child frequently from August 2008 until January 2011 but that she and M.B. had later begun to allow S.W. to visit only two or three days a week and to allow D.S. to visit every other weekend because, R.B. said, it was difficult to have a routine with them visiting so much. R.B. testified that, during one of D.S.’s visits, D.S. had taken the child to visit the mother at the jail against R.B.’s wishes and that, thereafter, around May 2010, R.B. began supervising S.W.’s and D.S.’s visits with the child.
According to R.B., S.W. had paid for the child to attend day care from August 2008 until April 2009, at which time S.W. informed R.B. she could no longer afford to pay for the day care. R.B. also testified that the mother had never provided her with financial assistance for the child. R.B. testified that, when she first picked up the child upon the mother’s arrest, the child never smiled, her clothes were dirty, and she was hungry. R.B. testified that the mother had visited the child every chance she had since she was released from prison and that the mother loves the child. R.B. testified that the mother and the child hug each other and enjoy their visits with each other. R.B. stated that, while the mother was in prison, the mother had telephoned M.B. and R.B. to check on the child. When asked whether her allegation that the mother’s substance-abuse issues interfere with her ability to take care of the child was no longer true, R.B. stated that the mother “does fine during the visits.”
R.B. testified that she and M.B. want to adopt the child and give her permanency. R.B. stated that the child calls her “mommy,” that she calls M.B. “daddy,” and that she considers R.B. and M.B. to be her parents. According to R.B., the child is not old enough to understand that she and M.B. are not her biological parents, and she does not believe the child understands that the mother is her mother, that S.W. is her great-grandmother, or that D.S. is her grandmother. R.B. stated that it was not her intention to cut off contact between the child and the mother, S.W., and D.S., because, she said, “[tjhis is her family, and I think that it would eventually backfire on myself and on [M.B.] and the fact that she would end up hating us in the long run if I kept her away from her family.” R.B. stated that she and M.B. intend to make sure that the child is in a safe environment and that she and M.B. can provide a stable life for the child.

Procedural History

On May 28, 2010, M.B. and R.B. filed a petition to terminate the parental rights of the mother and the father to the child in the juvenile court. M.B. and R.B. asserted that the mother was incarcerated and had been incarcerated “and/or furloughed *402 to court-ordered drug treatment since August 2008” and that the father was also incarcerated. M.B. and R.B. further asserted that they had legal custody of the child and that they intended to immediately make permanent plans to adopt the child upon the termination of the parental rights of the mother and the father.
The mother filed an answer on June 23, 2010, objecting to the termination of her parental rights. On August 18, 2010, the father filed a request to stay the proceedings; he stated that he was incarcerated and was scheduled to be released from prison on September 18, 2010, and he requested a continuance, pending his release from prison, in order to obtain counsel and to be present at any hearings in the matter. On October 29, 2010, the juvenile court denied the father’s motion to stay the proceedings and set the case for a trial on December 14, 2010. On December 10, 2010, M.B. and R.B. filed a motion to continue, asserting that the father had not been served with notice of the hearing; that motion was granted on that same day.
A guardian ad litem was appointed to represent the interests of the child on February 9, 2011. A trial was held on April 26, 2011. On April 27, 2011, the juvenile court entered an order terminating the parental rights of the mother and the father and awarding custody of the child to M.B. and R.B.
On May 6, 2011, the mother filed a motion to alter, amend, or vacate the juvenile court’s judgment, requesting oral argument on that motion. The juvenile court denied the mother’s postjudgment motion on May 9, 2011, without holding a hearing. The mother filed a notice of appeal to this court on May 17, 2011.

Standard of Review

“ ‘This court’s standard of appellate review of judgments terminating parental rights is well settled. A juvenile court’s factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. See, e.g., F.I. v. State Dep’t of Human Res., 975 So.2d 969, 972 (Ala.Civ.App.2007). Under express direction from our supreme court, in termination-of-parental-rights cases this court is “required to apply a presumption of correctness to the trial court’s finding[s]” when the trial court bases its decision on conflicting ore tenus evidence. Ex parte State Dep’t of Human Res., 834 So.2d 117, 122 (Ala.2002) (emphasis added). Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. F.I., 975 So.2d at 972.’
“J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007) (footnote omitted).”
C.M. v. Tuscaloosa Cnty. Dep’t of Human Res., 81 So.3d 391, 396 (Ala.Civ.App.2011).

Discussion

The mother first argues on appeal that the juvenile court erred in terminating her parental rights because, she says, M.B. and R.B. failed to present clear and convincing evidence demonstrating that she was unable and unwilling to discharge her responsibilities to and for the child and the juvenile court failed to consider viable alternatives to termination of her parental rights. We agree.
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly *403 consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004).
Section 12-15-319(a), Ala.Code 1975, provides, in pertinent part:
“If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
[[Image here]]
“(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child.
[[Image here]]
“(4) Conviction of and imprisonment for a felony.
[[Image here]]
“(9) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child, where the parent is able to do so.
[[Image here]]
“(11) Failure by the parents to maintain consistent contact or communication with the child.
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
The mother asserts that the evidence in the present case does not support the termination of her parental rights on the above grounds. In S.M.M. v. R.S.M., 83 So.3d 572 (Ala.Civ.App.2011), this court stated:
“The purpose of the statute authorizing termination of parental rights is to protect children from harm emanating from an adverse parental relationship. See generally Ex parte A.S., 73 So.3d 1223 (Ala.2011). A juvenile court may terminate parental rights in order to protect a child from harm, but the law demands that a juvenile court use less drastic measures than termination of parental rights if those measures would adequately protect the child from harm. See Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990). Hence, before entering a judgment terminating parental rights, a juvenile court must consider all alternatives, and, if the evidence shows that a viable alternative to termination of parental rights exists, the juvenile court cannot terminate parental rights. Id.”
83 So.3d at 573. The mother in S.M.M. had been released from a halfway house, had successfully completed a drug-rehabilitation program, and there was no evidence offered to suggest that she was using illegal drugs or that she was likely to relapse. Id. Additionally, the father had sole custo *404 dy of the child and had complete discretion over the mother’s visitation. Id. Citing Ex parte A.S., 73 So.3d 1223 (Ala.2011), this court reversed the juvenile court’s judgment, concluding that there was a viable alternative to terminating the mother’s parental rights, i.e., maintaining the status quo and allowing the mother to continue supervised visitation with the child, which, this court concluded, would adequately protect the welfare of the child while allowing for a beneficial relationship with both parents. 83 So.3d at 577.
In Ex parte A.S., supra, the Alabama Supreme Court reversed this court’s judgment affirming, without an opinion, the juvenile court’s judgment terminating the mother’s parental rights. See A.S. v. I.M.S. (No. 2090774, Nov. 19, 2010), — So.3d - (Ala.Civ.App.2010) (table). A.S., the mother, was in prison for theft of property, but she was behaving while she was incarcerated and receiving treatment for her kleptomania; the mother had no convictions involving drugs or abuse, she had maintained limited contact with the child through telephone calls to the child’s grandmother, who had custody of the child, and she had provided a small amount of support for the child. 73 So.3d at 1229. The supreme court held that maintaining custody of the child with the child’s grandmother and allowing the grandmother to determine and supervise the mother’s visitation while the mother was making progress toward rehabilitation was a viable alternative to termination of the mother’s parental rights. 73 So.3d at 1229-30..
In the present case, like in S.M.M. and Ex parte A.S., the mother is making progress toward rehabilitation. Additionally, the child in the present case is in the custody of M.B. and R.B., who, all the parties agree, are taking good care of the child and supervise the child’s visitation with the mother, S.W., and D.S. The mother presented evidence indicating that she has maintained a job and that she has not used drugs since her release from prison in November 2010, and no evidence was presented suggesting that the mother was using drugs or likely to relapse. Indeed, R.B. testified that the mother loves the child; that, while the mother was in prison, she had communicated with R.B. and M.B. regarding the child; that, while the mother was in prison and since her release, she had visited the child at every opportunity; and that R.B. and M.B. did not intend to discontinue contact between the mother and the child. Allowing M.B. and R.B. to maintain custody of the child and to oversee the mother’s visitation with the child is a viable alternative to terminating the mother’s parental rights while the mother continues to make progress toward rehabilitation.
Thus, the juvenile court erred in terminating the mother’s parental rights. We therefore reverse the juvenile court’s judgment terminating the mother’s parental rights, and we remand the cause to the juvenile court for the entry of a judgment consistent with this opinion.
The mother also argues that the juvenile court erred by failing to hold a hearing on the mother’s postjudgment motion. Because we are reversing the juvenile court’s judgment on the basis of the juvenile court’s error in terminating the mother’s parental rights, we decline to address this argument.
The mother finally argues that the juvenile court erred by terminating the father’s parental rights because the father was never appointed counsel. The father has not appealed from the judgment terminating his parental rights, and the mother does not have standing to assert the rights of the father. See W.T.H. v. M.M.M., 915 *405 So.2d 64, 72 (Ala.Civ.App.2005). Thus, we decline to address this argument.
REVERSED AND REMANDED.
PITTMAN, J., concurs.
BRYAN and THOMAS, JJ., concur in the result, without writings.
THOMPSON, P.J., dissents, without writing.

. The juvenile court’s judgment also terminated the parental rights of A.W., the father of the child. The father has not appealed the termination of his parental rights to this court.

. The mother was 25 at the time of the trial.