MOORE, Chief Justice
(dissenting).
The Jefferson Juvenile Court (“the juvenile court”) terminated B.M.’s parental rights to her -minor child, D.M. The Court of Civil Appeals then unanimously affirmed, without an opinion, the juvenile court’s judgment. B.M v. Jefferson Cnty. Dep’t of Human Res. (No. 2130346, October 17, 2014), — So.3d -(Ala.Civ.App. 2014) (table). B.M. petitioned this Court for a writ of certiorari to review the decision of the Court of Civil Appeals. This Court granted B.M.’s petition, issued the *698 writ, and, today, quashes the writ of certio-rari. I respectfully dissent.

I. Facts

Except where otherwise noted, the facts are not in dispute. B.M. has been the victim of cruelty and extreme suffering, having been raped five time's since she was five years old. B.M. has contracted the human immunodeficiency virus (“HIV”), for which she receives treatment and medication. She suffers from mental illness and claims to hear voices. She has three children, two of whom live with relatives. The oldest‘Child was born when B.M. was 14. The- child at issue here, D.M., is the youngest child. B.M. and D.M. love each other, and D.M. has bonded with his siblings.
Before D.M. was born, B.M.’s other children reported being touched inappropriately by another family member while B.M. was at work. B.M. took the children to Princeton Hospital and called the Jefferson County Department of Human Resources (“JCDHR”) to report the incident. After the incident, B.M. suffered a mental breakdown for which she sought treatment at the University of Alabama at Birmingham Hospital. Upon her release she was referred to Western Mental Health, and her children were placed in the custody of relatives.
D.M. was born on February 2, 2007. During her pregnancy with D.M., B.M. took prescribed medications to prevent D.M. from contracting HIV. D.M, was removed from B.M.’s custody by JCDHR when ■ he' was five days old, and B.M. has not had custody since then.
The parties dispute the degree to which B.M. cooperated with JCDHR to work toward reunification with D.M. B.M. alleges that she complied with JCDHR requests and made significant- progress toward JCDHR’s goals. She was, she says, consistent-with her visits with D.M., her employment, her doctor visits, and her- visits with D.M.-’s doctors. She has remained in contact with JCDHR and has received individual and-group counseling at Birmingham Aids Outreach. She has completed a drug screen that turned up negative. She participated in parenting classes and maintained stable housing, having lived -at the same residence for seven years. She is current on rent and other bills. Her house has three bedrooms and is furnished. D.M. has his own room in her house. This room has a bed, dresser, television, X-Box video-game console, clothes, shoes, sporting equipment, and a box of toys.
B.M. claims that she has consistently exercised unsupervised visitation with D.M. during the weekends, including overnight, and that her unsupervised visits continued until the day her parental rights were terminated. During her visits, she says, she and D.M. would play baseball, ride bikes, cook, eat meals, visit the park,’ watch movies, and visit stores and restaurants.
For roughly five months in 2012, B.M. and D.M. worked with Sabrina Franks, a behavior analyst, regarding D.M.’s behavior and need for discipline. D.M. suffers from separation anxiety and severe behavioral problems; including physical aggression, violence, aggression toward property, and verbal aggression. Franks implemented “timeout” procedures for D.M. and taught B.M. to incentivize D.M.’s good behavior. Franks observed that B.M. understood the different techniques Fi-anks had taught her and that D.M. was receptive to B.M.’s instruction. Franks’s primary concern was B.M.’s inconsistency using disciplinary practices.
D.M. receives treatment for his mental-health and behavioral issues and takes medication for his aggression and mood swings. His behavior has improved since *699 he began working with Franks. When Franks first encountered D.M., .D.M. had run away from his foster parent, had hit and bitten the foster parent, had cleared the countertop by,knocking everything off, had dumped water on the floor, and had urinated on the floor. D.M. has been kicked out of three or four day-care facilities; however, he now attends a day-care facility for children with behavioral issues and has begun taking tae kwon do martial-arts courses to redirect his aggression toward a constructive and disciplined activity-
D.M. has acted out sexually on B.M.’s leg and claims he learned this behavior from watching television. While in the care of his foster parents, he was twice hospitalized for his behavior. The foster parents did not inform B.M; about the hospitalizations until after D.M. was' released from the hospital.
B.M. does not trust D.M.’s foster parents. She alleges that D.M. shows up at visitations with scratches, bruises, burn marks, and fingerprints on his body after he leaves the foster' parents’ care. She believes that DHR does not take seriously her concern about these marks on D.M.’s body, and she worries that D.M.’s behavior arises out of the foster parents’ treatment of him. B.M. indicates that D.M.’s guardian ad litem also expressed concerns about the foster parents,
B.M. has never physically harmed or abused D.M. B.M.’s only act of physical confrontation, in fact,- occurred when a neighbor attempted to steal a necklace from D.M., and that confrontation did not involve D.M.
In 2012 B.M. began to work with Brandi Renfro, a therapist with the Specialized Alternatives for Families and Youth (“SAFY’). Renfro observed B.M. implementing proper parenting techniques. However, B.M.’s services with Renfro were discontinued upon B.M.’s request. B.M. missed some in-home-service visits with Renfro and canceled some visits with Renfro without rescheduling. B.M. claims that she discontinued services with Renfro because Renfro lied to her, claiming that B.M.’s oldest daughter no longer wished to visit B.M. B.M. says she lost trust in Ren-fro after this incident. B.M. did continue services with SAFY through a different therapist and completed a “Tools of Choice” program implemented by SAFY. This 5-week program consisted of 15 hours of class and in-home instruction. Franks testified that B.M. made progress during the Tools of Choice program and used the skills she learned through the program. B.M. received a certificate for completing the program.
Theodore Owens, a foster-care worker, testified that he received B.M. and D.M.’s case in May 2007 and maintained the case until October 2008. He saw B.M. caring for and interacting well with D.M. but was concerned about B.M.’s mental health and her ability to provide consistent, long-term care for D.M. He did not recommend unsupervised visitation between D.M. and B.M. On one occasion B.M. made an unannounced visit to Owens, at which B.M. appeared disoriented and was incoherent.
Tessa Miles, an adoption worker, was assigned to B.M. and- D.M.’s case from 2007 through 2009, She was reassigned to the case in 2010 and continued on the ease until 2011. Like Owens, Miles observed B.M. caring for.and interacting well with-D.M., but Miles maintained concerns about B.M.’s mental health. Miles testified that she was concerned B.M. might harm herself or others if B.M. was not taking her medication. Miles based this assessment on two occasions when B.M. failed to take her medications and acted erratically and aggressively. Miles also expressed con *700 cern about D.M.’s bad behavior and B.M.’s ability to control such behavior.
Moniqueca Barfield was a foster-care worker on B.M. and D.M.’s case from April 2011 through August 2011 and from October 10, 2012, to the date B.M.’s parental rights were terminated. Barfield expressed concerns about B.M.’s mental illness and B.M.’s ability to take her medications consistently; however, B.M. disputes Barfield’s account about how consistently B.M. took her medications. Barfield explained that B.M. enlisted in a continuum program to provide intensive in-home services to effect reunification with D.M. According to Barfield, B.M. participated in this program for six to seven months before beginning to refuse this service. Barfield testified that she had witnessed D.M. acting out while Bar-field was at the foster home. She claimed that D.M. had kicked the garage door of the foster home because the foster parents had refused to give him a toy he wanted. He then reentered the home, threw objects, knocked clean clothes on the floor, knocked over a bar stool, and called Barfield names. Barfield expressed concerns about B.M.’s mental health, her consistency in taking her medications, and her ability to control and supervise D.M.
The juvenile court terminated B.M.’s parental rights on December 17, 2013. The December 17, 2013, order was vacated, and a new order terminating B.M.’s parental rights was entered on January 9, 2014, in which the juvenile court made the following findings:
“The court heard the testimony of all witnesses who were first duly sworn. The court received into evidence certain properly authenticated exhibits. After due consideration of same, the court finds from clear and convincing evidence, competent, material and relevant in nature, that the child named herein is a dependent child pursuant to Title 12-15-102, Code of Alabama 1975.
“Based on the sworn testimony and evidence presented, this Court finds as follows:
“[D.M.] was born on February 2, 2007. He has been in DHR foster care since he was five days old. The mother had two older children who were removed from her custody previously.
“In addition, the mother reports that she is diagnosed with Bipolar Disorder and Psychosis [Not Otherwise Specified]. She is also positive for HIV.
“The mother suffers from visual and auditory hallucinations and has represented to the worker that at times she believes she is Jesus. She took herself off her medications several times. She has been hospitalized several times for psychiatric problems. There are concerns that she will not remain compliant with her medications for psychiatric treatment and her medications for HIV. “The mother refused to cooperate with in home continuum of care services through SAFY which included counseling. She teivninated these services and missed a number of appointments.
“The mother is currently in Mental Health Court for a pending criminal charge.
[[Image here]]
“Although the mother loves her child, this Court finds that the child cannot be safe with the mother due to her mental illness. She is unable to remain consistently on her medications and continues to have hallucinations. She cannot remain safe herself. She is unable to parent the child.
“[D.M.], the child herein, is a Special Needs Child who attends [a] [treatment [cjenter for children with serious behav *701 ior and emotional problems. - The child was in multiple day cares but was removed due to behavior issues. He attends the University of Alabama Child Psychiatry and is on multiple psychoactive medications. He is diagnosed with Oppositional Defiant Disorder "and Separation Anxiety.
“[D.M.] cannot tolerate change in his life. There appears to be no mother and child bond between his mother and him. The mother can be inappropriate with the child while visiting and, in May of this year, the child kicked the mother in the face.
“The court does find, pursuant to Title 12-15-319, Code of Alabama 1975, that the mother and any alleged or unknown father are unable to discharge their responsibilities to and for the child; that the conduct and condition of the mother and any alleged or unknown father are such as to render them unable to properly care for the child, and that such conduct and condition are unlikely to change in the foreseeable future.
[[Image here]]
“The mother and any alleged or unknown father have failed to adjust their circumstances to meet the child’s needs, pursuant to Title 12-15-319, Code of Alabama 1975, and Title 12-15-301, Code of Alabama 1975.
“The court also finds that there are no suitable relative resources willing or able to receive custody of the child.- The court finds there is no viable alternative to termination of parental rights in this ease. The child is determined to be adoptable.
“In addition, the court finds that the State of Alabama Department of Human Resources is willing and able to accept permanent legal custody, as provided in Title 12-15-320, Code of Alabama 1975.
“In accordance with Public Law 96-272, as amended by Public Law 105-89 and Section 12-15-319, Code of Alabama 1975', this Court further finds that it would be in the best interest of the child named herein to terminate the parental - rights of the child’s mother and father.”
The Court of Civil Appeals affirmed the juvenile court’s judgment without an opinion.

II. . Analysis .

B.M. argues that- the juvenile court erred because, she says, a less drastic alternative to termination exists; She alleges that the State failed to, demonstrate with clear and convincing evidence that B.M. could not discharge her parental duties.
To terminate a parent’s rights to his or her child, a trial court must find by clear and convincing evidence that the child is dependent and-that a less drastic alternative to the termination of parental rights is unavailable.. § 12-15-319, Ala.Code 1975; Ex parte Beasley, 564 So.2d 950, 952 (Ala. 1990). That clear and convincing evidence is the standard applicable in termination-of-parental-rights cases is set forth in § 12-15-319(a), Ala.Code 1975, which provides, in pertinent part:
“If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child -are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of-the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate -the parental rights of the parents.”
Clear - and convincing evidence, “ ‘when weighed against evidence in -opposition, will produce in the mind of the trier of'fact *702 a firm conviction as.to each essential element of the claim and a high, probability as to the correctness of the conclusion.’” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala. Civ.App.2002) (quoting § 6-11-20(b)(4), Ala.Code 1975).
B.M. argues that the State has not met its burden under the clear-and-convincing-evidence standard but merely emphasized her mental illness:
“DHR has not established by clear and convincing evidence that there is no less drastic alternative to [termination of parental rights] here. § [12-15-319(a) ], Ala.Code 1975. It is very clear that the only issue preventing reunification of the mother and [D.M.] is her mental illness. All of the service providers indicated their main concern was the mother’s mental illness. Each of the service providers stated that if mother stays on her medication, they do not sqe a problem.”
The record supports B.M.’s contention. There is no evidence indicating that B.M. abused, neglected, mistreated, -or abandoned D.M. B.M. did not abuse alcohol or controlled substances and did not maltreat D.M. B.M. was not incarcerated, and she never injured D.M. or placed D.M. at risk of serious bodily injury. Nor did D.M. suffer any physical injuries resulting from B.M.’s conduct. B.M..was no.t the cause of any physical harms visited upon her children, including D.M. It was another family member who -inappropriately touched B,M.’s other children, and this sexual predation occurred before D.M.’s birth and was reported by B.M. The record contains no evidence that D.M. was a victim of sexual molestation or abuse.
Nothing in the record supports the juvenile court’s finding that B.M. “believes she is Jesus.” B.M. testified that she saw images of Jesus when she heard voices. Asked what, Jesus - looks like, B.M. responded: “He’s kneeling down. He’s beige looking. He’s got the mustache over his face. And he’s kneeling down.on one knee and he’s wiping my tears, and telling me it’s okay, my child, I’m here.” B.M. testified that Jesus “pushes me forward and makes me think happy thoughts.” Barfield testified that B.M. saw Jesus and that Jesus spoke to B.M., but Barfield did not testify that B.M. believes herself to be Jesus. Instead, Barfield testified that B.M. had said “she felt like Jesus had taken over her body.” .
The juvenile court’s finding that B.M. is “in Mental Health Court for a pending criminal charge” is also questionable. The record indicates that B.M. had hired an attorney and was cleared of any criminal charges, although her case was referred to mental-health court. B.M. explained the charges and why they had been cleared: “Somebody stole my ÍD and used it and the Birmingham police came. But a sheriff came to my house saying that Bessemer wanted me on two possessions of controlled substance. One of the bonds was a signature, but I still had a five thousand dollar bond. It wasn’t me. It was somebody else using my identity.”
Furthermore, the juvenile court’s claim that there “appears to be no mother and child bond” is contradicted by the record. B.M. testified that her bond with D.M. was “very, very strong.” “He still remembers,” she testified, “the song I sung to him in the nursery.” Asked what that song was, B.M. responded: “Mommy loves you, mommy loves you, uh-huh, uh-huh, uh-huh. I will be back for you. Mommy loves you.”
Although Barfield testified that she believed there was no bond between- B.M. and D.M., she also claimed that B.M. loved D.M. and that, in the approximately seven years that D.M. was in JCDHR’s custody, Barfield had observed only six visits between D.M. and B.M. Moreover, Barfield *703 testified that B.M. had been enjoying unsupervised visitation with D.M,- for more than three years and was continuing, that unsupervised visitation at the time of trial. Barfield admitted that B.M. consistently visited D.M. and that JCDHR never terminated and never had cause to terminate B.M.’s unsupervised visitation with D;M.
B.M. sought treatment for her mental and physical health, and maintained employment, housing, and visitation with D.M. B.M. was never violent toward D.M. She made efforts to adjust her circumstances to meet D.M.’s needs. The foster-care and adoption workers in this case expressed concerns about B.M.’s ability to raise her children but did not state without qualification that she was incapable of raising her children, i.e., of discharging her parental duties. Even Barfield, who believed B.M.’s parental rights should be terminated, testified that her assessment would be different “if it was [sic] some stability with [B.M.]’s mental health and if she was compliant with her medication and [D.M.]’s.” The guardian ad litem likewise expressed reservations about terminating B.M.’s parental rights. These mixed assessments hardly give rise to “a firm conviction as to each essential element of the claim” or a “high probability as to the correctness of the conclusion” that B.M.’s parental rights should be terminated. L.M. v. D.D.F., 840 So.2d at 179. Absent clear and convincing evidence that B.M. could not discharge her duties as a parent, the State did not meet its burden of proving that a termination of parental rights would “ ‘protect the welfare of [D.M.] by providing stability and continuity in [his life], and at the same time ... protect the rights of [B.M.].’” Beasley, 564 So.2d at 952 (quoting § 26-18-2, Ala.Code 1975 (now repealed)). Furthermore, the juvenile court did not properly consider whether the termination of B.M.’s parental rights was in D.M.’s best interest.
“The prima facie right of a natural parent to the custody of his or her child ... is grounded in the common law concept that this primary parental right of custody is in the best interest and welfare of the child as a matter of law.” Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983). “There is a presumption that the child’s best interest will be served by placing it in the custody of the natural parents.” In re Hickman, 489 So.2d 601, 602 (Ala.Civ.App.1986). Pointing to B.M.’s mental health, JCDHR argues that it overcame this presumption. JCDHR highlights B.M.’s struggle with psychosis and bipolar manic depression and her tendency to - hear voices. The juvenile court accorded these factors great weight,, stating:
“Although [B.M.] loves [D.M.], this Court finds that [D.M.] cannot be safe with [B.M.] due to [B.M.’s] mental illness. [B.M.] is’unable to remain consistently on her medications and continues to have hallucinations. She cannot remain safe herself. She is unable to parent [D.M.].” ■
Evidence in the record, however, refutes those findings. For example, B.M. was prescribed medications for her mental illness and testified that she has taken those medications consistently. She testified that she discontinued some medications on her doctor’s orders. She was discharged from the hospital after receiving treatment for mental illness. She has seen therapists for her condition, which condition is, she testified, inconvenient only to the extent that it causes her to forget where she placed her house keys or shoes. She acknowledged that she has a problem with mental health and admitted that she hears voices, but she does not feel threatened by the voices, which, she claimed, have never instructed her to do bad things. When asked what the voices say. to her, she responded: “Good things. Tell me it’s *704 okay, stop crying, everything going ’to be all right, and I always see a picture of Jesus.” B.M. has never held suicidal thoughts and has never attempted to harm herself or her children.[1] B.M.’s' only physical altercation was with a neighbor who attempted to steal a necklace from D.M.
The present case is analogous to S.M.M. v. R.S.M., 83 So.3d 572 (Ala.Civ.App.2011), in which the Court of Civil Appeals reversed an order of the Etowah Juvenile Court terminating a mother’s parental rights because “the father presented no evidence indicating that the mother’s supervised visits had endangered the child physically or emotionally.” S.M.M., 83 So.3d at 574. The mother in S.M.M. used drugs, had committed a theft, and had been incarcerated from June 2009 through July 2010. B.M. has done nothing of the sort and is thus entitled to the same relief afforded the mother in S.M.M.. “Although the evidence,” both here and in S.M.M., “indicates that the mother suffers from mental-health conditions, no evidence was offered to suggest that she posed a physical threat to the child or that the mother’s treatment and medication were insufficient to address her mental-health conditions.” S.M.M., 83 So,3d at 577. This is important because the “purpose of the statute authorizing termination of parental rights is to protect children from harm emanating from an adverse parental relationship.” S.M.M., 83 So.3d at 573 (citing Ex parte A.S., 73 So.3d 1223 (Ala.2011)).
The record here suggests that the juvenile court was equally, if not more, concerned about D.M.’s bad behavior than it was about B.M.’s ability to parent. In effect, the juvenile court reversed the determinant roles of parent and child, finding that B.M. was unfit to enjoy parental rights, not because of her own violence or indiscretion but because of D.M.’s capacity for mischief. The juvenile court found specifically that D.M. had kicked B.M. in the face and that B.M. generally was unable to control D.M. Yet D.M. was never threatened or unsafe in B.M.’s care. Nor did' B.M. jeopardize D.M.’s physical well being or bodily integrity. It does not take an expansive imagination to envision the potential problems and absurdities that might arise if courts were to begin disproportionately basing their termination-of-parental-rights. decisions on the behavior of children rather than on the behavior of parents.
This Court “ ‘has consistently held that the existence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.’ ” Ex parte T.V., 971 So.2d 1, 5 (Ala.2007)(quoting D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003)). B.M. has' struggled throughout her life, but she has taken steps to improve the quality of her health and her relationship with D.M. She may struggle with mental-health issues, but the evidence suggests that her mental-health problems are alleviated by medication. B.M. may not be a model parent — nor D.M. a model child — but the State may not easily or without due cause sever the' natural ties between a parent and a child. The law does not require parental perfection. “Only in the most egregious of circumstances” is a child’s best interest served by the termination of parental rights, Beasley, 564 So.2d at 952.
“A finding of dependency alone will not allow a trial court to terminate a parent’s *705 rights to his or her child; the trial court also must find by clear and convincing evidence that there are no viable alternatives to the termination of parental rights.” T.V., 971 So.2d at 7. Although the juvenile court declared in its order terminating B.M.’s parental rights that “there is no viable alternative to termination of parental rights in this case,” including no suitable relative resources willing or able to receive custody of the child, “it is not clear from the record what possible viable alternatives might have been found.” T.V., 971 So.2d at 7. “The record as it currently stands ... does not demonstrate that the trial court examined all the viable alternatives to the termination of [B.M.’s] parental rights.” T.V., 971 So.2d at 8. The juvenile court’s “conclusion that there are no viable alternatives to terminating [B.M.’s] parental rights is not supported by dear and convincing evidence” and is thus due to be reversed. T.V., 971 So.2d at 10.

III. Conclusion

The evidence in this case “does not rise to the level of being so clear and convincing as to support termination of the parental rights of the mother, such action being the last and most extreme disposition permitted by statute.” A.M. v. St. Clair Cnty. Dep’t of Human Res., 146 So.3d 425, 435 (Ala.Civ.App.2013). “The termination of parental rights is an extreme matter and is not to be considered lightly.” S.K. v. State Dep’t of Human Res., 993 So.2d 15, 24 (Ala.Civ.App.2008). “Because the record does not contain evidence that a fact-finder reasonably could find to clearly and convincingly establish that [B.M.’s] current conduct or condition renders her unable to properly care for [D.M.],” I would reverse the Court of Civil Appeals’ judgment and remand the case with instructions for that court to reverse and remand to the juvenile court for further proceedings. M.G. v. Etoivah Cnty. Dep’t of Human Res., 26 So.3d 436, 444 (Ala.Civ. App.2009). Therefore, I dissent from quashing the writ.

. Asked whether she ever had suicidal thoughts, B.M. said, "No.” Asked whether she had ever attempted suicide, B.M. said, "No, ma’am. Not that I can be aware of, no, ma’am. I never wanted to hurt myself.”