THOMPSON, Presiding Judge.
A.M. (“the mother”) appeals from judgments of the St. Clair Juvenile Court (“the juvenile court”) terminating her parental rights to her four children, F.P., D.P., C.M., and V.M. (hereinafter collectively “the children”). G.M. (“the father”) appeals from the judgments terminating his parental rights to the two children he had with the mother, C.M. and V.M. (“the father’s children”). This court consolidated the appeals ex mero motu. The parental rights of E.P., the father of F.P. and D.P., also were terminated; however, E.P. did not appeal. Accordingly, we will not include facts relating only to E.P. in this opinion.
The record indicates the following. The father had previously worked as a welder but had nearly severed a finger on his left hand — his dominant hand — and had also injured his back. During the time St. Clair County Department of Human Resources (“DHR”) was working with the family, the father did not have steady employment; he earned money from recycling scrap metal. He would scrape rust from the scrap metal and leave the scrap metal in the family’s yard. The mother conceded that, at times, the yard would have been dangerous to the children because of the scrap metal.
The mother did not work outside the home. She suffers from a congenital hip condition for which she sometimes takes prescription pain medication. The mother testified that she had applied for Social Security disability benefits, but her application had been denied.
DHR first became involved with this family in January 2009, when the mother’s mother (“the maternal grandmother”), who lived with the family, was injured in a fall at the home and required hospitalization. A worker from DHR’s adult-protective-services division conducted an investigation. Because of excess clutter and an infestation of roaches in the home, a decision was made not to return the maternal grandmother to the home. The maternal grandmother required a wheelchair, and the excessive clutter in the house, as well as a lack of ramps, would impede her ability to move about the house. The maternal grandmother was placed in a nursing home, where she still resided at the time of the trial.
Sue Latham, a DHR social worker, testified that there were concerns for the children during the investigation arising from the maternal grandmother’s fall; however, the children were not removed from the house at that time. Latham became involved with the family in March 2009, when there was a fire in the kitchen of the house. F.P., who was 13 years old at the time, was alone in the house with C.M., then 2 years old, while the mother and D.P. visited the mother’s obstetrician. The mother was about to give birth to V.M., her youngest child. When the fire broke out, F.P. took C.M. to a neighbor’s house to call the fire department because there was no telephone at their house. After the fire, the family stayed at a motel for several weeks while repairs were made to the kitchen. The American Red Cross paid for the motel stay.
Because of the uncleanliness of the home, DHR provided services to the mother and the father in an effort to teach them housekeeping and parenting skills. However, the children were not removed from the home until July 12, 2010, when *427 the mother tested positive for the use of opiates and the father tested positive for the use of marijuana. The mother testified that she had taken pain medication that had been prescribed for her on earlier occasions but that she had not discarded in a timely manner. The mother’s testimony was consistent with DHR’s assertion that the mother was taking pain medication in a manner that was not prescribed by her treating physicians. The mother tested positive for opiates on various occasions throughout the time DHR was working with her.
After the children were removed from the home, DHR increased the services it was providing to the mother and the father, including providing individual and family counseling. Glenn Margaree, a counselor, began working with the family in July 2010 to address the issues that led to the children’s removal from the home, including the father’s drug use, the mother’s and father’s neglect of the home and the children and their leaving the children to care for themselves, and the mother’s and the father’s issues with anger management, conflict resolution, and domestic violence.
Margaree first visited with the mother and the father at their home in July 2010, when the children were first removed from the home. Margaree testified that the home was in a state of disrepair and infested with roaches. When them appointments were moved to her office, Margaree said, the mother and the father missed appointments or were frequently late. Margaree said she determined that the father was lazy, an opinion that she supported by pointing out that he had failed to maintain employment, and that he exhibited controlling behavior. Margaree also concluded that both the mother and the father were emotionally unstable.
The mother completed one set of parenting classes, but because DHR workers did not believe the mother’s parenting skills had improved sufficiently, she was asked in June 2012 to enroll in a second parenting class. In addition to parenting classes, the mother started attending a substance-abuse class. However, the mother said, those classes ended before she completed the course. A psychological evaluation performed on the mother by psychologist Dr. Yolanda Suarez indicated that the mother had displayed symptoms of depression that were exacerbated by her chronic hip pain. However, Dr. Suarez did not find anything that led her to be concerned that the mother was engaged in child abuse or substance abuse, and she did not regard the mother as a threat to the children.
At the trial, Latham testified that although the mother had visited the children consistently, she had to be prompted to call the children or to send them letters. The older children’s foster mother testified that the mother would call regularly only for a short time after Individual Sendee Plan (“ISP”) meetings with DHR and for a short time before scheduled court dates.
Latham also testified that she had observed both the mother and the father interact with the children. During her time with them, Latham said, she did not see anything that would lead her to believe that either one could successfully parent the children. Connie Allen, Latham’s supervisor at DHR, testified that, during the time DHR had been working with her, the mother would make strides but then fall back into old patterns of behavior.
Latham testified that the father completed a psychological assessment and assessments regarding parenting and anger management. He was referred to job and marriage counseling, anger-management classes, and parenting classes. Latham *428 initially said that the father did not complete any of those programs before August 2011, when he moved to Ohio, but she later testified that she had erred in her earlier testimony and that the father had completed the courses. However, she said, the father had not taken part in any services since August 2011, although he had taken part in ISP meetings by telephone. La-tham also noted that the father did not test positive for any illegal drug between the July 2010 test that led to the removal of the children from the home and the father’s August 2011 move to Ohio; however, she said, he had not submitted to a drug test since moving to Ohio.
During the termination hearing, the juvenile court ordered the father to submit to a drug test. The results of that test were positive for the use of marijuana. The father explained that, because he had had cancer surgery the week before the trial, he had eaten medical marijuana, which had previously been prescribed to him as Marinol.[1] The father had surgery in Ohio on the first day of the trial in this matter. His attorney had requested a continuance because of the scheduled surgery, and the father submitted a physician’s note indicating that the surgery was to be performed on September 17, 2012, the first day of the trial. The motion to continue was denied. Despite the physician’s admonition to the father that he not travel, the father appeared for the last day of the trial, September 19, 2012.
At trial, the mother acknowledged that she took pain medications when her hip was especially painful. DHR’s position was that the medication she was taking had been prescribed on earlier occasions and that the prescriptions were no longer valid at the time the mother was taking the medication. Drug tests administered to the mother in January 2011 and October 2011 were negative; however, the mother again tested positive for opiates in July 2012, just two months before the trial.
At the time of the trial, neither the mother nor the father lived in the same location they had when the children were removed from the home. As mentioned, the father was living in Ohio. By January 2012, the mother had moved to a one-bedroom apartment, which DHR workers said was neater and more organized than the mother’s previous residence, and had been placed on a waiting list for a larger apartment to accommodate the children. The mother was also working at a fast-food restaurant in January 2012. In July 2012, the mother moved to a two-bedroom apartment. She testified that she intended for the children to use the bedrooms and she would sleep on the couch. Allen, Latham’s supervisor, testified that, at the time of the trial, the mother had continued her employment, had obtained housing, had a working vehicle and insurance, and was attending the second parenting class that had been recommended to her.
The father testified that he moved to Ohio to obtain a job. At the time of the *429 trial, he lived with his girlfriend and her children. The father acknowledged that he had not seen the children from the time he moved to Ohio in August 2011 until July 2012; however, he estimated that, before moving, he had missed only 4 of about 50 visitations available to him. He also said that he spoke on the telephone with the children regularly.
Both the mother and the father were in arrears on their court-ordered child-support payments. At the time of trial, the mother owed $7,000 in past-due support. The mother testified that the father owed between $30,000 and $40,000 in past-due child support. The father also testified that before the children had been removed from the home, they had never been hungry, they had always had a place to live, they had had all of their inoculations, and they had a pediatrician. He also said that he helped the children with their homework, which F.P. acknowledged.
F.P., the mother’s oldest child, was 15 years old at the time of the trial. She testified that she did not wish to return to the mother’s home. She said that her mother related to her “more like a friend” than a daughter. F.P. said that, in her opinion, the mother was unable to adequately care for the children. For example, F.P. said, the mother was unable to set a routine for the children to follow, she was unable to properly discipline the children, and she could not control the children. She also testified that the mother had failed to teach the children basic hygiene skills, good nutrition, and the like. For example, F.P. said, when she first entered foster care, she weighed approximately 290 pounds. Under the guidance of her foster parents, F.P. said, she had lost more than 80 pounds. F.P. described the father as “controlling” of both the children and the mother.
F.P. also testified that the father, her stepfather, had taken the children with him to Birmingham on more than one occasion to buy marijuana. She also told DHR workers that she had seen her mother peeling the coating off of the pain medications she took, which apparently intensified the drugs’ effects.
F.P. said both the mother and the father relied on her to do chores around the house and to care for the younger children. She described the parties’ residence as being “nasty,” with piles of clothes and trash everywhere about the house. F.P. also said that roaches infested the house and that, when one picked up clothes, roaches would scatter. There were occasions when the utilities were turned off at the house because of unpaid bills, F.P. said. The record also indicates that D.P., F.P.’s younger brother, sent a letter to the judge stating that he, too, wished to remain with his foster parents.
Both the mother and the father provided DHR with lists of possible relative placements for the children. Two individuals from the lists were seriously considered. The mother’s father initially said he would serve as a relative placement for the children. In March 2012, after a home study was conducted, DHR approved the mother’s father for placement. Overnight visits were arranged for the children at the mother’s father’s house. On May 31, 2012, the day the children were to move in with their maternal grandfather, he contacted DHR and declined to serve as a resource for the children.
The father’s list included several family members, but he did not include contact information for some of those family members. Latham said that she contacted the father’s mother (“the paternal grandmother”), who initially said that she wanted to be involved, but she hoped that all four children could remain together *430 and hoped that one of the parents could obtain custody. The paternal grandmother did not respond to Latham’s first written inquiry as to whether she would be willing to take custody of the children. However, in March 2012, before DHR filed its April 2, 2012, termination petitions, DHR received a letter from the paternal grandmother in which she agreed to serve as a placement for the children. From the record, it appears that only the father’s children, C.M. and V.M., were being considered for placement with the paternal grandmother. The paternal grandmother lives in Michigan, and DHR requested that the State of Michigan perform a home study pursuant to the Interstate Compact on the Placement of Children (“ICPC”). However, DHR did not make the request until July 2012, and the study of the paternal grandmother’s home had not been completed at the time of the September 2012 termination hearing. According to ICPC documents contained in the record, the paternal grandmother is an “administration assistant” and her husband is a licensed attorney with a private practice in family law.
The termination hearing in this matter was held in September 2012, and the juvenile court entered its judgments terminating the parental rights of the mother, the father, and E.P. six months later, on March 19, 2013. In December 2012, between the trial and the entry of the judgments, the Michigan home study was completed, and the paternal grandmother was approved for placement of the father’s children, C.M. and V.M.; however, a comment on the cover page of that same form stated: “Placement cannot be approved at this time. Upon family completing foster care licensing AND Interstate approval placement may be approved.” The cover sheet also stated: “Interstate services appear complete. Our Interstate case is closed.” The apparent contradiction in the statements on the same page of the form is not explained. Nonetheless, in January 2013, the paternal grandmother filed a petition for custody of the children. According to the case-action summaries in these cases, the petition was denied after a May 13, 2013, hearing.
Both the mother and the father filed timely appeals from the judgments terminating their parental rights. As mentioned, E.P. did not appeal.
With regard to reviewing a judgment in a termination-of-parental-rights case, this court has stated:
“This court’s standard of appellate review of judgments terminating parental rights is well settled. A juvenile court’s factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. See, e.g., F.I. v. State Dep’t of Human Res., 975 So.2d 969, 972 (Ala.Civ.App.2007). Under express direction from our supreme court, in termination-of-parental-rights cases this court is ‘required, to apply a presumption of correctness to the trial court’s finding[s]’ when the trial court bases its decision on conflicting ore ten-us evidence. Ex parte State Dep’t of Human Res., 834 So.2d 117, 122 (Ala. 2002) (emphasis added). Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. F.I., 975 So.2d at 972.”
J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007) (footnote omitted).
“Clear and convincing evidence” is “ ‘[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction *431 as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala.Code 1975, § 6-ll-20(b)(4)).
Section 12-15-319, Ala.Code 1975, provides, in pertinent part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
In the judgments, the juvenile court stated that it had initially found the children to be dependent because of the parents’ drug use, domestic violence in the home, and neglect by the parents. It determined that the children remained dependent. It also found that DHR had provided numerous services to the mother and the father to facilitate reunification with the children. It noted that different methods of instructing the parents were used in the hopes of finding a method that would benefit the parents. Nonetheless, the juvenile court stated, the evidence indicated that the parents had failed to attend several appointments or had been consistently late to appointments. Accordingly, the juvenile court found, the parents had failed to take advantage of the services provided by DHR.
The juvenile court also noted that the mother had failed to attend scheduled visits with the children, had failed to provide financially for the children, had failed to complete services aimed at rehabilitation, and had failed to obtain suitable housing for the children. The juvenile court determined that the mother was “unwilling and clearly unable to discharge [her] responsibilities to and for [her] children,” that her condition was such as to render her unable to properly care for the children, and that her condition was unlikely to change in the foreseeable future. After noting the length of time the children had been in foster care, the juvenile court stated that the children “are entitled to permanency and deserve safety and stability in their everyday interactions with their caretakers.” It then determined that termination of the mother’s and the father’s parental rights was in the children’s best interests.
The mother argues that, although she is still not consistent with discipline and although she serves her children corndogs or other foods of questionable nutritional value, “there is no evidence whatsoever that [she] cannot currently parent her four children or would be unable to care for them in the future.”
When deciding whether to terminate parental rights, “the primary focus of a court ... is to protect the welfare of children and at the same time to protect the rights of their parents.” Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). Thus, “a court should terminate parental rights only in the most egregious of circumstances.” Id. (emphasis added). In Ex parte T.V., 971 So.2d 1 (Ala.2007), our supreme court reversed this court’s affirmance of the trial court’s termination of T.V.’s parental rights. In T.V., the children were removed from T.V.’s custody because T.V. was addicted to crack cocaine, was homeless, did not have a job or transportation, and was unable to perform her parental duties. She also was facing criminal misdemeanor charges. Id. at 3.
In reversing the trial court’s judgment terminating T.V.’s parental rights, our supreme court noted that both the court’s *432 order and the record in the termination-of-parental-rights case established that T.V. had met the goals that DHR had originally set for her, stating:
“[T.V.] is no longer homeless, and she has dealt with her drug problem. She reconciled with and married D.R.V., the father of her first child. Through involvement with their church, T.V. and D.R.V. • have quit using illegal drugs. T.V. testified that she has been drug-free since July 20, 2002. T.V. ministers to people with substance-abuse problems. She has maintained employment since July 20, 2002, with short interruptions. She has voluntarily contributed small amounts to [her child’s] support; these amounts total $270 since 2004.”
Id. Our supreme court continued:
“We do not believe that the evidence in this case clearly and convincingly supports the factual finding that there are no viable alternatives to terminating T.V.’s parental rights. The trial court’s order includes a factual finding that T.V. has stopped using drugs, that she has reconciled with her family, that she participates in raising and supporting her other son, and that she regularly attends church. The only reason the trial court offered as justification for its finding that there is no viable alternative to the termination of T.V.’s parental rights was T.V.’s failure to visit N.V. and the child’s corresponding inability to know her as his mother. However, the only evidence in the record regarding the effect of these absences on N.V. was the testimony that N.V. did not understand who T.V. was and the social worker’s testimony that a bond between N.V. and T.V. was emerging. The trial court’s concern that T.V. ultimately wanted to regain custody of N.V. does not, in itself, provide clear and convincing evidence that the current situation in which T.V. is allowed to visit with N.V. is untenable. Both B.S. and C.S. testified that they would eventually have to tell N.V. that he is not their natural son. The child still carries T.V.’s last name, and he uses that name at school. Thus, given that N.V. will one day have to learn that he is not B.S.’s natural son, visitation — which upon all accounts does not harm N.V. and which the guardian ad litem concluded is good for N.V. — would appear to be a viable alternative to the termination of T.V.’s parental rights. Therefore, the conclusion that there are no viable alternatives to terminating T.V.’s parental rights is not supported by clear and convincing evidence.”
Id. at 9-10 (footnote omitted).
Similarly, in A.H. v. Houston County Department of Human Resources, 122 So.3d 846, 852 (Ala.Civ.App.2013), this court reversed the trial court’s judgment terminating A.H.’s parental rights. We note that, in A.H., the children had not lived with A.H. for 30 months. In reversing the trial court’s judgment, this court wrote:
“In the present case, DHR failed to present clear and convincing evidence demonstrating that [A.H.] continues to suffer from a drug or alcohol addiction or that [A.H.] is ‘unable or unwilling to discharge [her] responsibilities to and for the [children], or that the conduct or condition of [A.H.] renders [her] unable to properly care for the [children] and that the conduct or condition is unlikely to change in the foreseeable future.’ § 12-15-319(a), Ala.Code 1975. ‘This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.’
*433 D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App. 2003). Although [A.H.] had not attended a substance-abuse-treatment program, she had passed every drug test except the most recent one before trial, which she did not take due to time constraints imposed by her house arrest. Albeit with the help of her family, [A.H.] had procured suitable housing for the children. Since May 2012, [A.H.] has also consistently exercised visitation with the children.
“ ‘ “ ‘[T]he termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated. The evidence in [this] ease[ ] “does not rise to the level of being so clear and convincing as to support termination of the parental rights of the mother, such action being the last and most extreme disposition permitted by statute.” ’ ” “ ‘D.O. v. Calhoun County Dep’t of Human Res., 859 So.2d 439, 445 (Ala.Civ.App.2003) (quoting V.M. v. State Dep’t of Human Res., 710 So.2d 915, 921 (Ala.Civ.App.1998)).’
“[Ex parte ] AS, 73 So.3d [1223] at 1230 [ (Ala.2011) ].”
122 So.3d at 852.
In this case, Connie Allen, La-tham’s supervisor at DHR, and Latham both testified that the mother had obtained and continued her employment; that she had continuously maintained transportation and insurance; that she had obtained housing, although she had only lived in her new apartment a matter of months; and that she was attending her second set of parenting classes, although she had not yet completed the classes. Allen questioned the stability of the mother’s housing situation. The juvenile court apparently agreed, finding that the mother had “failed to obtain suitable housing capable of accommodating her children.” However, in S.K v. Madison County Department of Human Resources, 990 So.2d 887, 900 (Ala.Civ.App.2008), this court noted the following:
“The evidence indicated that, before DHR became involved in the case in 2003, the family had been living for seven or eight years in a small but adequate mobile home that the father owned and for which he was paying only $75 per month in lot rent. DHR, however, opined that the mobile home was too small and induced the father to move. From that point on, the father was engaged in a struggle to find living quarters that would satisfy DHR and still be within his means. Given the father’s efforts to find suitable housing in the face of financial difficulty, we cannot hold that his having multiple addresses was a factor indicating his unwillingness to discharge his parental responsibilities to his children. On the contrary, his multiple attempts to obtain a suitable residence tended to show his willingness ■ to do whatever it took to fulfill the requirement that DHR had set for him with respect to housing, even if meeting that requirement was more costly than his former housing had been. The housing issues the father faced appeared to be more a function of his poverty than any other factor. ‘ “[P]overty alone is not enough to warrant the termination of parental rights.” C.B. v. State Dep’t of Human Res., 782 So.2d 781 (Ala.Civ.App.1998).’ A.J.H.T. v. K.O.H., 983 So.2d 394, 406 (Ala.Civ.App.2007).”
In this case, the mother moved out of the roach-infested house where the family had lived and moved into a one-bedroom apartment. She placed her name on a list to move to a larger apartment and had been able to make that move only a month *434 or two before the trial. DHR workers acknowledged that, since moving from the old house, the mother’s residences had been neat and clean. Moreover, we note that DHR did not remove the children from the mother and the father because of the clutter and roach infestation. The children continued to live in the home for a year and a half after DHR became aware of the condition of the family’s house. It was not until the mother and the father tested positive for the use of opiates and marijuana, respectively, that the children were removed from the home. It appears from the evidence that the mother has obtained the most suitable housing she is able to afford for herself and the children, and her inability to afford to live in a residence with more bedrooms cannot be the basis for the termination of her parental rights.
Allen also noted that the mother’s pattern had been to take part in various classes, but, she said, the mother failed to complete them. Allen testified that the mother had missed one visit with the children because she was incarcerated, and, she said, the mother had been late for some visits, “or in the past I think she erided some early due to boredom and stuff.” Therefore, Allen said, she did not believe the mother was doing “100% of what she should do.” Additional evidence indicated that the results of a random drug screen performed on the mother on July 17, 2012, were positive. However, both Latham and Allen acknowledged that, at the time of the trial of this matter, the mother had met or was making progress toward meeting the goals that DHR had established for her.
Admittedly, the mother has much room for improvement in her parenting skills, and she continues to misuse prescription pain medication. We also recognize that 15-year-old F.P. would have preferred more structure in her life, and she expressed an unhappiness that the mother treated her more like a friend than as a daughter. We are not unsympathetic to the child’s wishes or her desire for a different parenting style; however, neither issue raised by F.P. is a sufficient basis on which to terminate the mother’s parental rights. Furthermore, the mother may not have been diligent in arriving on time to appointments, meetings, and visitation with the children, but there is not clear and convincing evidence that she is or will be unable or unwilling to care for the children’s needs.
“It is because the termination of parental rights implicates ‘[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child,’ Santosky [ v. Kramer ], 455 U.S. [745] at 753, 102 S.Ct. 1388 [(1982)], that such an exacting level of certainty based on evidence of the parent’s current situation is required. Thus, while we must presume under the ore tenus rule that the trial court’s factual findings are correct, that rule does not relieve this Court of its responsibility to ensure that those facts clearly and convincingly warrant the termination of parental rights.”
Ex parte T.V., 971 So.2d at 9.
Moreover, as noted,
“ ‘ “[t]he termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated ....’”
“D.O. v. Calhoun County Dep’t of Human Res., 859 So .2d 439, 445 (Ala.Civ. App.2003) (quoting V.M. v. State Dep’t of Human Res., 710 So.2d 915, 921 (Ala. Civ.App.1998)).”
Ex parte A.S., 73 So.3d 1223, 1230 (Ala. 2011); see also A.H., 122 So.3d at 852.
This is a difficult case. However, we conclude that the evidence in this case, like *435 the evidence in the cases cited above, does not rise to the level of being so clear and convincing as to support termination of the parental rights of the mother, such action being the last and most extreme disposition permitted by statute. In short, based on the evidence contained in the record, we hold that this case does not involve “the most egregious of circumstances” meriting the termination of parental rights. See Ex parte Beasley, 564 So.2d at 952. Accordingly, we conclude that the juvenile court erred in terminating the mother’s parental rights.
The father argues that the juvenile court erred in terminating his parental rights to C.M. and V.M. because, he says, DHR failed to make reasonable efforts to reunite him with his children. Specifically, the father contends that even though he had moved to Ohio, DHR was not “absolved from responsibility for providing services leading toward reunification to a parent who is located out of state, and more specifically, ... merely instructing a parent to seek out services on his own is not sufficient to meet DHR’s burden of making reasonable efforts.” The father cites D.S.S. v. Clay County Department of Human Resources, 755 So.2d 584, 589-90 (Ala.Civ.App.1999). We find M.H. v. Calhoun County Department of Human Resources, 848 So.2d 1011, 1016-17 (Ala.Civ.App.2002), to be more on point, however. In M.H., we affirmed the judgment terminating M.H.’s parental rights, distinguishing her circumstances from those of the father in D.S.S. as follows:
“The mother also argues that DHR failed to offer her rehabilitative services once she moved to Iowa. Although we have held that DHR is required to investigate and, if necessary, to provide rehabilitative services to a parent who resides in another state before proceeding with a termination of that parent’s parental rights, see D.S.S. v. Clay County Department of Human Resources, 755 So.2d 584, 590-91 (Ala.Civ.App.1999), we cannot agree that D.S.S. supports the mother’s argument in this case. The failure of DHR to provide services to the mother upon her move to Iowa cannot be considered in isolation. In D.S.S., DHR had failed not only to offer any rehabilitative services to the father, who resided in Georgia, but also to even investigate the father’s circumstances to determine if he needed those services. In the present case, DHR provided services to the mother for almost two years, during which time the mother made little and unsustained improvement. The record compels the conclusion that, despite DHR’s attempts to rehabilitate her, the mother, for whatever reason, has been unable to commit to making the changes necessary to entitle her to the return of her children.”

Id.

In this ease, the father had been receiving services from DHR before he moved to Ohio. DHR workers testified that they believed that the father was still in need of the services DHR provided; for example, they recommended that he take an additional parenting class. They explained to the father that DHR would not be able to provide services to him once he moved; nonetheless, the father chose to move out of state, where he could not avail himself of the services that might enable him to regain custody of his children. Therefore, we cannot conclude that DHR was required to continue to provide services to the father after he moved to Ohio. Accordingly, we also cannot conclude that the juvenile court erred in determining that the father failed to take advantage of the services DHR offered to him in an effort to rehabilitate the father. However, our inquiry into the propriety of the termi *436 nation of the father’s parental rights to his two children, C.M. and V.M., does not end here.
A finding of dependency alone will not allow a trial court to terminate a parent’s rights to his or her child; the trial court also must find by clear and convincing evidence that there are no viable alternatives to the termination of parental rights. Beasley, 564 So.2d at 954. Before terminating parental rights, a trial court must consider and reject all potential viable alternatives. See T.V., 971 So.2d 1; A.D.B.H. v. Houston Cnty. Dep’t of Human Res., 1 So.3d 58, 63-64 (Ala.Civ.App.2008); and B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004).
The record indicates that in March 2012 the paternal grandmother notified DHR that she was interested in being a relative-placement resource for the father’s children. The petitions seeking the termination of the father’s parental rights were not filed until April 2, 2012. In July 2012, four months after the paternal grandmother had expressed her interest and three months after it had filed its petitions to terminate the father’s parental rights, DHR submitted the necessary paperwork to the State of Michigan requesting that its social-service agency conduct a home study on the paternal grandmother. The home study had not been completed as of the time of the September 2012 termination hearing, and the father requested a continuance pending the outcome of that home study. The paternal grandmother was approved for placement before the juvenile court entered its March 18, 2013, judgments terminating the father’s parental rights.
“ ‘The party seeking to terminate a person’s parental rights thus has the burden of producing dear and convincing evidence that there are no viable alternatives to the termination of parental rights. Ex parte Ogle, 516 So.2d [243] at 247 [ (Ala.1987) ]; see also K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App. 2003) (holding that the party seeking to terminate the parental rights of another bears the burden of proving that termination of those rights is the appropriate remedy).’ ”
C.E.W. v. P.J.G., 14 So.3d 166, 170-71 (Ala.Civ.App.2009) (quoting Ex parte T.V., 971 So.2d at 9).
Based on the record before us, we conclude that DHR failed to present clear and convincing evidence that there were no viable alternatives to terminating the father’s parental rights. The paternal grandmother is not an ideal candidate to be a relative resource for the father’s children. The record indicates that she did not know the children well, that she had not spent time with the children, and that she did not seek custody of the children the majority of the time they were in foster care. Nonetheless, before the termination petitions were filed, the parental grandmother indicated her interest in serving as a relative placement for at least C.M. and V.M., the father’s children. However, DHR went forward with filing its petitions to terminate the father’s parental rights before it began its investigation into the paternal grandmother’s suitability as a relative placement.
We note that DHR waited four months after learning of the paternal grandmother’s interest before submitting its request to the State of Michigan pursuant to the ICPC regarding the paternal grandmother. Had the request been made in a more timely fashion, the results may have been available at the time of the termination hearing.
Based on the record before us, we conclude that DHR failed to meet its burden of proving by clear and convincing evi *437 dence that no viable alternative existed to the termination of the father’s parental rights. Although we do not necessarily hold that the paternal grandmother should be considered a viable alternative to the termination of the father’s parental rights, we conclude that, based on DHR’s failure to meet its burden with regard to demonstrating the absence of viable alternatives to the termination of the father’s parental rights, the juvenile court erred in failing to consider the paternal grandmother as a relative-placement resource. Accordingly, we conclude that the juvenile court erred in entering judgments terminating the father’s parental rights to his children, C.M. and V.M.
For the reasons set forth above, we conclude that the juvenile court erred in terminating the parental rights of both the mother and the father. As mentioned, this is a close case that ultimately turns on our determination that there is not clear and convincing evidence to support the juvenile court’s judgments. We are mindful of the court’s mandate “to protect the welfare of children and at the same time protect the rights of their parents,” Ex parte Beasley, 564 So.2d at 952, and to terminate parental rights “only in the most egregious of circumstances.” Id. Accordingly, the judgments entered in this matter are reversed. In reaching this conclusion, this court is not foreclosing DHR’s ability to file subsequent termination petitions in this matter, nor are we to be understood to imply that the children are to be immediately returned to the custody of the mother. We hold only that a termination of the mother’s and the father’s parental rights was premature based on the record before us.
2120556, 2120557, 2120558, and 2120559 — REVERSED.
2120589 — REVERSED.
PITTMAN and DONALDSON, JJ., concur.
THOMAS and MOORE, JJ., concur in the result, without writings.

. Although the father testified that he had had cancer surgery, the physician’s note that accompanied the father's motion for a continuance, dated August 2, 2012, indicated that the father had visited the doctor because a "screw in head came out, pain on top side of head.” The physician’s note stated that "images of the head were obtained” and that there was "no evidence of mass, hemorrhage or infarct.... There is a 1 cm soft tissue density in the scalp in the midline over the frontal bone. The underlying calvarium is intact.” The note indicated that the father’s brain was "normal” but that he had a "small soft tissue mass in the midline over the frontal bone. This may represent a small tumor, dermoid cyst or hematoma. Clinical correlation is recommended.” There was no mention in the note that the father had cancer or had ever had cancer. The record also does not provide information as to why the father had a screw in his head.