THOMPSON, Presiding Judge.
On June 11, 2015, the Madison County Department of Human Resources (“DHR”) filed in the Madison Juvenile Court (“the juvenile court”) four separate petitions seeking to terminate the parental rights of A.H. (“the mother”) and J.P. (“the father”) to their four minor children, all of whom were born between 2011 and January 2015. The juvenile court consolidated the four actions and conducted an ore tenus hearing on DHR’s petitions on October 28, 2015.
On November 2, 2015, the juvenile court entered four virtually identical judgments in which it ordered that the mother’s and the father’s parental rights be terminated to each of their four children. On November 9, 2015, the mother filed a “motion to reconsider,” and on November 10, 2015, she filed a motion requesting a new trial in each of the four actions. The father filed a postjudgment motion in each action on November 10, 2015. The juvenile court entered orders on November 10, 2015, denying the mother’s postjudgment motions, and it denied the father’s postjudgment motions on November 12, 2015. Both parents timely appealed to this court; this court consolidated the appeals.
The grounds warranting a termination of parental rights are set forth in § 12-15-319, Ala.Code 1975. With regard to the consideration of a petition seeking to terminate parental rights, this court has explained:
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternar tives to a termination of parental rights.”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004) (citing Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990)) (emphasis added). The appellate courts must apply a presumption of correctness in favor of the juvenile court’s judgment in a termination-of-parental-rights action. J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). “Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence.” Id.
In their briefs submitted to this court, each parent argues only that the juvenile court erred in determining that there were no viable alternatives to the termination of his or her parental rights. See Ex parte Beasley, supra. Neither the mother nor the father argues that the juvenile court erred in its dependency determinations or in determining that grounds existed under § 12-15-319 warranting the termination of their parental rights. Arguments not asserted on appeal are deemed to have been waived. Boshell v. Keith, 418 So.2d 89, 92 (Ala.1982) (“When an appellant fails to argue an issue in its brief, that issue is waived.”).
The juvenile court made the following relevant factual findings in its judgments:
“Matters pertaining to the custody and welfare of the children of [the mother] came to the attention of [DHR] when a report was received on or about December 6, 2013, indicating that on December 5, 2013, she had given birth to [M.K.P.] in a toilet at her residence. The maternal grandmother was present in the home when that child was born.
*563 “The reporter expressed concern that the mother and/or the maternal grandmother delayed seeking medical attention for the newborn. Apparently the child was still in the toilet, with the umbilical cord still attached to the mother, when emergency medical personnel were summoned.
“[M.K.P.], who was bom prematurely, was hospitalized for several weeks. During that time [DHR] investigated the initial report and began monitoring the welfare of his siblings. [DHR] and the mother entered into a safety-plan agreement, under the terms of which [M.K.P.] and his siblings, [A.H.] and [J.P., Jr.,] were permitted to remain in the home with the mother, under the supervision of maternal relatives. (The fourth child, [J.K.H.[1]] had not yet been born.) Thereafter the maternal grandmother was incarcerated for reasons not apparent from the testimony, and [DHR] began to have concerns about the willingness and capability of other relatives to monitor and protect the children.
“During this period of time, the local Health Department was also involved with the family with regard to tuberculosis. (The testimony did not indicate who in the household suffered from that illness, but such diagnosis apparently led to a Health Department employee monitoring the family and reporting to [DHR] concerns about the welfare of the children.) The Health Department employee reported that the mother yelled at the children, that she was not holding the infant properly, and that her interactions with the children were ‘negative.’
“In or about February 2014, [M.K.P.] was again hospitalized, with a diagnosis of failure to thrive, and [J.P., Jr.,] was hospitalized for respiratory difficulties.
“As a result of concerns over the safety and welfare of the three children, [DHR] eventually effected a summary removal of them from the home and filed petitions in this Court alleging that they were dependent. Following a shelter care hearing conducted on March 10, 2014, those children were placed in the pendente lite custody of [DHR]. Following an adjudicatory hearing on the dependency petitions conducted on June 19, 2014, those children were placed in the temporary legal custody of [DHR], Immediately upon the birth of [J.K.H.] in January 2015, he, too, was removed from the care of the mother and placed in the pendente lite custody of [DHR]. He was placed in [DHR’s] temporary legal custody following an adjudicatory hearing on April 23, 2015. Since the summary removals and shelter care hearings, the children have remained in foster care, and none has been returned to the custody of a parent. [J.K.H.] has never been in the custody of a parent since his birth.
“In order to assess the parenting capabilities of the mother, [DHR] arranged and paid for a psychological evaluation which was completed by Dr. Lois Petrella. Dr. Petrella’s testing revealed the mother has a full-scale Intelligence Quotient of 62. Dr. Petrella found the mother’s prognosis to be ‘poor due to low intelligence.’ She opined that ‘results of this assessment suggest that [the mother] does not possess adequate levels of intelligence, insight and judgment required for raising children.’ She recommended that the children remain in [DHR’s] care.
*564 “In an effort to facilitate possible reunification with the mother, [DHR] offered reunification services which included parenting training. [DHR’s] worker testified that the mother attended some training sessions but missed others. In her testimony, the mother candidly acknowledged that she had not completed parenting training because she ‘did not want to’ do so.
“During the time the child and the child’s siblings have been in the care of [DHR], the mother has paid no child support, although she is employed. She and the maternal grandmother have, however, provided gifts, including clothing, for the children. The mother has also exercised visitation with the children.
“The Court finds, from clear and convincing evidence, that the mother is unable or unwilling to discharge her responsibilities to the children. The Court further finds that the conduct and condition of the mother is such as to render her unable or unlikely to change in the foreseeable future.
“The mother of the children is not now, and has never been, married. DNA paternity testing completed in July 2015, establishes a 99.99% probability that [the father] is the biological father of all four children, and the parties have stipulated that he is the father. The Court now adjudicates [the father] to be the father of all four of the above-named children.
“Despite undisputed evidence that the father was aware of the mother’s pregnancies and the birth of the children; despite his own belief that he was the father of one or more of the children; and despite placement of the children in foster care in March 2014, the father made no apparent effort for more than one year to contact [DHR], to visit the children, to inquire into their well-being, or to otherwise fulfill his duties as a parent.
“[DHR's] social worker testified that she first met the father in September 2014. After that date, the social worker made numerous and diligent efforts to arrange DNA paternity testing. She spoke with the father by telephone on several occasions and had him provide her several convenient dates for testing. She set up the testing, but the father repeatedly failed to appear to give a DNA sample and failed to communicate with the social worker. DNA samples were taken from the mother and each of the children, but the father did not submit to paternity testing until July 14, 2015, some sixteen months after the three older children were brought into [DHR’s] care.
“The father acknowledges in his testimony that he has been convicted of possession of cocaine, a felony, on two occasions, and that a third felony charge of possession of cocaine is now pending in the Circuit Court of Madison County, Alabama.
“The father lacks stable housing and employment. He testified that he had spent recent nights at the home of a relative in the Mason Court public housing development. He acknowledged that he is not on the lease for that apartment, and he is likely ineligible to lawfully reside in public housing due to his felony drug convictions.
“During the time the children have been in the care of [DHR], the father has paid no child support. There is no evidence before the Court that he has provided any gifts or otherwise provided for the material needs of any of the children.
“The Court finds, from clear and convincing evidence, that the father is un *565 able or unwilling to discharge his responsibilities to the children. The Court further finds that the conduct and condition of the father is such as to render him unable or unlikely to change in the foreseeable future.
“In determining whether to terminate parental rights, the Court is obligated to consider factors which include, but are not limited to, the presumptive right of the parents to raise their child; the presumptive right of the child to be raised by his parents; the efforts made by the parents to rehabilitate themselves to a point at which they may safely parent the child; the efforts made by [DHR] to offer reunification services to the parents; the personal history and conduct of the parents; the length of time the child has been out of the custody of the parents; the efforts, or lack of efforts, by the parents to provide at least minimal material support for the child while the child has been out of their care; the efforts, or lack of efforts, by the parents to maintain contact and visitation with the child; and, in ore terms proceedings, the demeanor and credibility of the witnesses. The Court has considered each of those factors in this matter and has concluded that no viable alternative to termination of parental rights exists which would meet the permanency needs of the child. The best interests of the child require that the parental rights of the child’s parents be terminated.”
In addition to the foregoing, the juvenile court determined that there were no viable alternatives to the termination of the parents’ parental rights. The evidence presented on that issue indicates that the children were placed in foster care in March 2014. Carmen Rice, the DHR social worker assigned to the children between March 2014 and June 2015, testified that, in April 2014, she contacted J.P.W., the children’s paternal grandmother, to inquire whether she would serve as a relative placement for the children. It is undisputed that the paternal grandmother refused to become involved until she was provided DNA test results establishing the father’s paternity of the four children. Rice testified regarding her repeated efforts to have the father submit to DNA paternity testing. Rice stated that the father had failed to appear for scheduled testing numerous times. In addition, Rice testified that the mother had contacted the father on a monthly basis between September 2014 and June 2015 to discuss the DNA testing; according to Rice, the mother always told her that the father had said he would contact Rice.
In late June 2015, Tiffany Wiley, another DHR social worker, was assigned to the children’s cases. Wiley testified that the father submitted to DNA testing in mid-July 2015 and that that testing established his paternity of all four children. We note that the youngest child was born in January 2015, after the three older children had been in foster care for almost one year.
Wiley testified that she contacted the paternal grandmother in early August 2015 and informed her of the paternity-test results. At that point, the paternal grandmother stated that she would serve as a placement for the children. The paternal grandmother lives in another county, so the process for obtaining a home evaluation resulted in the paternal grandmother’s home being approved only shortly before the termination-of-parental-rights hearing. That home study was favorable to the paternal grandmother, but it noted that the paternal grandmother’s boyfriend, who lived in the home, was convicted of felony assault in connection with his shooting of another man in 2002. Ac *566 cording to the DHR home study and the testimony of Wiley in response to questioning by the juvenile court, the boyfriend claimed that he shot the other man in self-defense.
At the termination hearing, the paternal grandmother testified that the father had informed her that he “had a child” at the time of the oldest child’s birth in 2011. She also admitted that he had informed her of the births of the other three children, and she stated that her niece had also told her that her son had fathered the four children. However, although she lived approximately one hour away from the family, the paternal grandmother had never seen or met any of the four children.
The paternal grandmother stated that, during the period that these young children were in foster care, she had been busy taking care of her adult child, who had had two strokes and was disabled. The paternal grandmother also testified that the father had never brought the children to visit her and that she had not attempted to visit them.
In their briefs submitted to this court, the parents rely on similar theories and authority in support of their argument that placing the children with the paternal grandmother was a viable alternative to the termination of their parental rights. The mother cites A.M. v. St. Clair County Department of Human Resources, 146 So.3d 425 (Ala.Civ.App.2013), in support of her argument that DHR did not demonstrate that it had investigated all relative resources. In AM., supra, the paternal grandmother in that case, who lived in Michigan and did not know the children well, had initially not been willing to serve as a resource for the children. One month before the St. Clair County DHR filed its termination petition, the paternal grandmother notified the DHR social workers that she was willing to serve as a relative resource for two of the four children, but DHR delayed initiating paperwork for a home study for four months. The home study had not been completed at the time of the termination hearing. This court reversed the termination judgment as it pertained to the father in that ease, concluding that the juvenile court had erred “in failing to consider” the paternal grandmother as a viable relative resource for the children. A.M. v. St. Clair Cty. Dep’t of Human Res., 146 So.3d at 437.
Both parents cite V.M. v. State Department of Human Resources, 710 So.2d 915 (Ala.Civ.App.1998), in which this court reversed a termination-of-parental-rights judgment when the maternal grandmother, who initially refused to be a resource for the children, later notified the State DHR of her interest in taking the children but did not follow through with contacting DHR to arrange the home study. DHR did not perform a home study, and, after two more years, the juvenile court directed DHR to file the termination petition. This court concluded, among other things, that DHR had failed to investigate the maternal grandmother’s current circumstances and that, therefore, because of a failure of proof on the issue of the maternal grandmother’s current circumstances, the juvenile court had erred in determining that there were no viable alternatives to termination. V.M., 710 So.2d at 921.
The father also cites M.H. v. Cleburne County Department of Human Resources, 158 So.3d 471 (Ala.Civ.App.2014), in which relatives had initially been unwilling to provide a home for the children but changed their minds a few weeks before the Cleburne County DHR filed its termination petitions. The evidence indicated that DHR had not timely or adequately investigated those relatives before the termination hearing, and this court, among other things, concluded that the juvenile *567 court had erred in determining that DHR had met its burden of demonstrating that there were no appropriate relative resources in that case. M.H. v. Cleburne Cty. Dep’t of Human Res., 158 So.3d at 483.
The parents rely on those cases to support their contention that DHR did not meet its burden of demonstrating that the paternal grandmother was not a suitable placement for the children. We note, however, that the authorities on which the parents rely are distinguishable, first, because in A.M., supra, V.M., supra, and M.H., supra, the prospective relative resources sought to be considered as placements for the children before the termination-of-parental-rights petitions were filed and, second, because DHR’s efforts to investigate the prospective relative placements were either not prompt or not completed before the termination hearings in those cases.
Moreover, the most significant distinction between the facts of this case and those of the authorities relied upon by the parents in their appellate briefs is that, in this case, DHR presented evidence regarding the paternal grandmother’s current circumstances and the juvenile court carefully considered that evidence. With regard to the parents’ contention that placing the four children with the paternal grandmother was a viable alternative to the termination of their parental rights, the juvenile court found in each of its termination judgments:
“Having determined that neither the mother nor the father of the child is presently able, or likely to become able in the reasonably foreseeable future, to effectively and safely parent the child, the Court has considered alternatives to termination of parental rights, including permanent placement with a relative. With the exception of the child’s paternal grandmother, as discussed below, neither [DHR], the Court, the guardian ad litem, nor the parents have been able to identify any relative who might assume custody of the child. Relatives who were considered were either unwilling or unable to assume custody and provide permanency for the child.
“[DHR] previously requested a home study to be conducted by the Dallas County, Alabama, Department of Human Resources with respect to the paternal grandmother, who is a resident of Selma, Alabama. Immediately before the hearing, [DHR] received a generally favorable report of that home study, which was offered in evidence for the Court’s consideration. Additionally, the paternal grandmother appeared and testified at the hearing on termination of parental rights.
“For approximately thirteen years, the paternal grandmother has resided with a man she describes as her flaneé, and with her adult daughter, who is handicapped as a result of having suffered strokes. The [paternal] grandmother testified that she was aware of the existence of the children who are at issue in this case when each was born (although she was unable to state when any of them were born). She was likewise aware, when each was born, that her son was likely the biological father. Her son and a niece both informed her of those facts, and she also occasionally spoke by telephone with the mother. From the time each of the three older children was born, and continuing until [DHR] became involved with the children, the paternal grandmother made absolutely no effort to meet any of the children, and she did nothing to establish any relationship with any of them. (As noted above, the fourth child was *568 born after [DHR] became involved with the family.)
“Shortly after [DHR] became involved with the three older children, a social worker contacted the paternal grandmother to inquire about her availability as a relative resource for them. The grandmother responded that until such time as DNA testing proved a biological connection to her son, she would not become involved with the children. She stated that if DNA testing proved her son to be the father, she would be interested in ‘being involved/ in some unspecified manner, with the children.
“Even after she became aware of [DHR’s] involvement with the children, the paternal grandmother still made no effort to see the children or to establish any relationship with them. In fact, she acknowledged in her testimony that as of the date of the hearing, she had yet to even see, in person, any of the four children.
“After careful review of the Dallas County home study report; after consideration of the paternal grandmother’s demeanor and her ore tenus testimony; after consideration of her failure to have or seek to have even the slightest relationship with the children before the hearing on termination of parental rights; and after consideration of all the evidence adduced herein, the Court finds that placement with the paternal grandmother would be contrary to, and not in the best interests of, the children, and that such placement is not a viable alternative to termination of parental rights. Furthermore, the Court cannot conclude, from the evidence, that the paternal grandmother will meet the permanency needs of the children.
[[Image here]]
“[DHR] has considered less drastic alternatives to filing a petition to terminate parental rights. Neither [DHR] nor this Court believes that there is any alternative less drastic than termination of parental rights available to serve the best interests of the child. Placement alternatives which were considered were determined not to be in the child’s best interests. Despite a diligent search, [DHR] has been unable to locate a suitable relative to assume custody of the child.
“The Court finds that [DHR] has made reasonable efforts to identify and locate suitable relatives of the child in order to determine whether such relatives might provide care for the child, thus avoiding the necessity of terminating parental rights. Those efforts have been to no avail. No suitable relative has been located, and no suitable relative is known to the Court.
“The best interests of the child require that the parental rights of the child’s parents be terminated and that the child be placed in the permanent legal custody of the Alabama Department of Human Resources for the purpose of adoptive planning.”
Thus, the record in this case demonstrates that, unlike in the cases cited by the mother and the father in their appellate briefs, the juvenile court did consider the paternal grandmother as a potential resource for the children. However, the juvenile court rejected the paternal grandmother as a viable alternative to termination. The parents argue that the evidence does not support that decision. This court has explained:
“Before terminating parental rights, a juvenile court must determine that there are no viable alternatives. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). One viable alternative is placement of the child at issue with a suitable relative qualified to receive and care for the *569 child while the parent completes the rehabilitative process, when such placement serves the best interests of the child. See Ex parte J.R., 896 So.2d 416 (Ala.2004). A relative is suitable and qualified to receive and care for a child when the relative ‘can safely and properly discharge the parental responsibilities of meeting the child’s needs during the child’s minority.’ J.B. v. Cleburne County Dep’t of Human Res., 991 So.2d 273, 283 (Ala.Civ.App.2008). Whether a relative is suitable to assume custody of a child and whether such placement serves the best interests of the child are both questions of fact to be determined by the juvenile court. See T.B. v. Cullman County Dep’t of Human Res., 6 So.3d 1195, 1204-05 (Ala.Civ.App.2008).”
R.L.M.S. v. Etowah Cty. Dep’t of Human Res., 37 So.3d 805, 812 (Ala.Civ.App.2009). “ ‘On appeal from ore tenus proceedings in a termination-of-parental-rights case, this court presumes that the juvenile court’s factual findings regarding viable alternatives are correct.’” T.V. v. B.S., 7 So.3d 346, 352 (Ala.Civ.App.2008) (quoting J.B. v. Cleburne Cty. Dep’t of Human Res., 991 So.2d 273, 282 (Ala.Civ.App.2008)).
In this case, the evidence indicated that the father informed the paternal grandmother that he had four children and that the paternal grandmother had never met the children. The paternal grandmother refused to serve as a placement for the children when the children were first placed in foster care, and she refused to consider serving as a placement until she received scientific proof of the father’s paternity of the four children. The paternal grandmother stated that she had heard “rumors” that the children were not the father’s, which caused her not to become involved with the children. However, as the juvenile court noted in its judgments, it is the province of the juvenile court, as the trier of fact, to observe the witnesses as they testify and to assess their demean- or and credibility. See Ex parte Fann, 810 So.2d 631, 633 (Ala.2001). Based on the juvenile court’s ability to observe the witnesses during an ore tenus hearing, this court must afford a presumption of correctness to its factual findings. Id. It appears from the juvenile court’s findings in its termination judgments that the juvenile court did not consider the lack of definitive scientific proof of the father’s paternity to excuse, under the facts, the paternal grandmother’s failure to attempt any type of contact with the children. We note that although the juvenile court was required to consider the paternal grandmother’s current circumstances in evaluating her as a potential relative resource, it was not required to disregard her past conduct with regard to the children.
In rejecting placing the children with the paternal grandmother as a viable alternative to termination, the juvenile court cited the foregoing evidence, as well as its concerns about the paternal grandmother’s boyfriend, who lives in the home, and her need to take care of her disabled adult daughter. Although the paternal grandmother testified that she would make the boyfriend leave her home if necessary in order to obtain custody of the children, the credibility of that claim was for the juvenile court to determine. See Ex parte Fann, supra. The juvenile court concluded that it did not believe that the paternal grandmother could meet the children’s needs for permanency.
In his brief, the father relies on T.V. v. B.S., supra, in which, on remand following a reversal, the juvenile court concluded that there were no viable alternatives to termination. In reaching that determination, the juvenile court in that case relied, in part, on the testimony of expert witnesses who had examined the child. In relying on that authority, the father in this case argues that, unlike in T.V. v. B.S., *570 supra, the evidence does not suggest that placing the children with the paternal grandmother would be harmful or not in their best interests. In making that argument, the father ignores that the children have never met their paternal grandmother and that she declined establishing a relationship with them in spite of the father's informing her that the children were his children.
It is clear that the juvenile court carefully considered the evidence presented to it regarding the paternal grandmother as a possible relative resource for the children. The juvenile court determined, under the facts of this case, both that the paternal grandmother was not a viable alternative to termination and that placing the children with her would not be in the children’s best interests. Those determinations are within the discretion of the juvenile court, and they are entitled to a presumption of correctness on appeal. See R.L.M.S. v. Etowah Cty. Dep’t of Human Res., supra; see also M.J.C. v. G.R.W., 69 So.3d 197, 208-10 (Ala.Civ.App.2011) (explaining that a last-minute offer to serve as a relative resource to forestall termination was not a viable alternative to the termination of parental rights). Given the evidence in the record on appeal, we cannot say that the mother and the father have demonstrated that the juvenile court exceeded its discretion in determining that placing the children with the paternal grandmother was not a viable alternative to the termination of their parental rights. Accordingly, we affirm.
2150160—AFFIRMED.
2150201—AFFIRMED.
PITTMAN, THOMAS, MOORE, and DONALDSON, JJ., concur.

. The youngest child is referred to at places in the judgments and in the record on appeal as "J.K.P.,” but in the style of the action pertaining to that child and in the style of the judgment pertaining to that child, the child is referred to as "J.K.H."